# 𝔘nited 𝔖tates 𝔆ourt of 𝔄ppeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued April 7, 2022               Decided May 26, 2023

No. 20-1512

SIERRA CLUB, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

EQUITRANS, L.P., ET AL.,
INTERVENORS

————

Consolidated with 21-1040

————

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

————

*Benjamin A. Luckett* argued the cause for petitioners. With him on the briefs were *Elizabeth F. Benson* and *Julie Gantenbein*.

*Matthew W.S. Estes*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and

2

*Robert H. Solomon*, Solicitor.  *Scott R. Ediger*, Attorney Advisor, entered an appearance.

*Jeremy C. Marwell* argued the cause for respondent-intervenors Mountain Valley Pipeline, LLC, et al.  With him on the joint brief were *Matthew Eggerding*, *Matthew X. Etchemendy*, *James T. Dawson*, *Jennifer Leigh Flint Brough*, *Thomas Knight*, *Randall S. Rich*, *Valerie Layne Green*, *Charlotte Taylor*, and *James Olson*.

Before: SRINIVASAN, *Chief Judge*, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:  For years, Mountain Valley Pipeline, LLC has been trying to build its eponymous Mountain Valley Pipeline through West Virginia and Virginia.  In 2017, the Federal Energy Regulatory Commission first issued a certificate approving the project.  Our court affirmed that order.  But to build an interstate natural gas pipeline, a company often needs additional federal permits from agencies other than the Commission.  Mountain Valley needed approvals from the Bureau of Land Management, Forest Service, Army Corps of Engineers, and Fish and Wildlife Service.  While Mountain Valley initially obtained each of those additional permits, the United States Court of Appeals for the Fourth Circuit vacated all of them over time.

The Commission responded with a series of follow-up orders.  As Mountain Valley reacquired permits from the other agencies, the Commission extended the deadline for completing construction and authorized work to resume. Several environmental groups now petition for review of the Commission's orders allowing the project to proceed.

3

We deny most of their claims and conclude that one is moot.  But we agree with one of the claims:  that the Commission inadequately explained its decision not to prepare a supplemental environmental impact statement addressing unexpectedly severe erosion and sedimentation along the pipeline's right-of-way.  While we grant the petitions for review in part on that ground, we do not vacate the Commission's orders allowing work on the project to resume.  Instead, we remand the orders without vacatur to enable the Commission either to prepare a supplemental environmental impact statement or to better explain why one is unnecessary.

I.

A.

The Natural Gas Act authorizes the Federal Energy Regulatory Commission to regulate the interstate transportation of natural gas.  15 U.S.C. § 717.  A company desiring to build a natural gas pipeline must first obtain a certificate of "public convenience and necessity" from the Commission.  *Id.* § 717f(c).

The Commission's certificate process incorporates review of proposed projects under the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 *et seq*.  *See Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022).  NEPA "declares a broad national commitment to protecting and promoting environmental quality, and brings that commitment to bear on the operations of the federal government." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (quotation marks and citation omitted).  To that end, NEPA requires federal agencies to "identify the reasonable alternatives to a contemplated action and look hard at the

4

environmental effects of their decisions." *City of Bos. Delegation v. FERC*, 897 F.3d 241, 246 (D.C. Cir. 2018) (alteration, quotation marks, and citation omitted).

Agencies first prepare a draft environmental impact statement discussing the effects of the proposed action and of reasonable alternatives. 40 C.F.R. § 1502.9(b). A final environmental impact statement then accompanies an agency's ultimate decision. *Id.* § 1502.9(c). But an agency's obligations under NEPA do not always end there. An agency must supplement its environmental analysis if "substantial changes to the proposed action" or "significant new circumstances or information" raise additional concerns about the action's environmental impact. *Id.* § 1502.9(d)(1)(i)–(ii).

B.

In 2017, the Commission issued a certificate of public convenience and necessity for the Mountain Valley Pipeline. Order Issuing Certificates and Granting Abandonment Authority, *Mountain Valley Pipeline, LLC*, 161 FERC ¶ 61,043 (Oct. 13, 2017) (Certificate Order), J.A. 86–221. The Pipeline would carry natural gas 303.5 miles across the Appalachian Mountains, from Wetzel County, West Virginia, to an interconnection with a compressor station in Pittsylvania County, Virginia. The Commission determined that Mountain Valley had shown market demand for the Pipeline based on five shipping contracts, known as precedent agreements, covering the Pipeline's full capacity.

In its final environmental impact statement, the Commission recognized that construction of the Pipeline would cause at least some soil erosion and sedimentation. To build the Pipeline, Mountain Valley would clear a 125-foot-wide corridor along the route, which would expose the soil to

5

wind and rain.  The company would then dig or blast a trench in which to bury the Pipeline, dislodging more dirt for runoff. And much of the construction would occur near and across waterbodies.  In those circumstances, sedimentation would be unavoidable.  But the Commission concluded in the environmental impact statement that control measures such as silt fences would minimize effects on waterbodies.  And in the end, Mountain Valley planned to return the route to as close to its original state as practicable.  The Certificate Order adopted the final environmental impact statement and declared the Pipeline "environmentally acceptable."  *Id.* ¶ 308.

When approving the project, the Commission also imposed conditions concerning when construction could begin and by when it needed to end.  At the front end, the Certificate Order's Environmental Condition 9 required Mountain Valley, "before commencing construction of any project facilities," to submit "documentation that it has received all applicable authorizations required under federal law."  Certificate Order, App. C, Environmental Condition 9.  At the back end, the Commission directed Mountain Valley to complete construction within three years, by October 13, 2020. Certificate Order ¶ 310.

Several environmental groups petitioned our court for review of the Certificate Order.  We rejected their challenge. *Appalachian Voices v. FERC*, Nos. 17-1271, 18-1002, 18-1175, 18-1177, 18-1186, 18-1216, 18-1223, 2019 WL 847199 (D.C. Cir. Feb. 19, 2019) (per curiam).  We concluded that the Commission had reasonably found a market need for the Pipeline based on the "precedent agreements for 100 percent of the Project's capacity."  *Id.* at *1.  As for the order's environmental analysis, we determined that the Commission had "adequately considered and disclosed erosion and sedimentation impacts on aquatic resources."  *Id.* at *2.

6

C.

In addition to obtaining a certificate from the Commission, a pipeline project must also "comply with all other federal, state, and local regulations not preempted by the [Natural Gas Act]." *Dominion Transmission, Inc. v. Summers*, 723 F.3d 238, 240 (D.C. Cir. 2013). Depending on a pipeline's proposed route and potential impacts, permits from various other federal agencies might be needed.

The Mountain Valley Pipeline would traverse more than three hundred waterbodies, requiring a permit from the Army Corps of Engineers. The Pipeline would also cut across Jefferson National Forest, requiring authorization from the Department of Interior's Bureau of Land Management and the Department of Agriculture's Forest Service. And the Pipeline would intersect with the habitats of endangered species, requiring the approval of the Fish and Wildlife Service.

Mountain Valley obtained all of those necessary permits, and, pursuant to Environmental Condition 9, received the Commission's authorization to break ground, which it did in February 2018. In the ensuing months, though, the United States Court of Appeals for the Fourth Circuit vacated each of the other federal permits.

First, in July 2018, the Fourth Circuit vacated the authorizations from the Bureau of Land Management and the Forest Service allowing pipeline construction through Jefferson National Forest. *Sierra Club, Inc. v. U.S. Forest Serv.*, 897 F.3d 582 (4th Cir. 2018). The Commission initially responded with a stop work order due to the possibility that the Bureau of Land Management and Forest Service might require the Pipeline to follow a different route through the national

7

forest.  Within a few weeks, though, the Commission allowed construction to resume along most of the Pipeline's route.  The Commission reasoned that completing construction and restoration work on non-federal lands would best serve the environment.  Still, the Commission continued to prohibit construction within a 25-mile "exclusion zone" encompassing the crossing of the national forest and the adjacent watersheds.

The Fourth Circuit subsequently set aside Mountain Valley's verification from the Army Corps of Engineers.  There are two ways for Mountain Valley to obtain approval from the Army Corps of Engineers:  it can comply with an existing nationwide permit, or it can acquire an individual permit specific to the Pipeline.  *See Sierra Club v. W. Va. Dep't of Env't Prot.*, 64 F.4th 487, 495 (4th Cir. 2023).  Mountain Valley chose the first route, and the Huntington District of the Army Corps of Engineers verified that construction of the Pipeline could proceed under an existing nationwide permit.  In October 2018, however, the Fourth Circuit vacated that verification.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 905 F.3d 285 (4th Cir. 2018) (mem.) (order vacating verification); *Sierra Club v. U.S. Army Corps of Eng'rs*, 909 F.3d 635 (4th Cir. 2018) (opinion explaining order).  Two other Army Corps of Engineers districts then also suspended their authorizations for the Pipeline.  Mountain Valley paused work on all stream crossings in those districts.

Next, Mountain Valley lost its approval from the Fish and Wildlife Service.  In August 2019, in response to new information about the Pipeline's potential impact on certain listed species, Mountain Valley suspended construction in various watersheds where those species live.  The Commission then asked the Fish and Wildlife Service to reopen consultation on the Pipeline under the Endangered Species Act.  Given those developments, the Fourth Circuit granted a stay of the Service's

8

prior approval of the Pipeline.  *See Wild Va. v. U.S. Dep't of Interior*, No. 19-1866 (4th Cir. Oct. 11, 2019) (order granting stay).

At that point, Mountain Valley had lost three federal authorizations it needed for construction:  from the Bureau of Land Management and Forest Service to build in Jefferson National Forest, from the Army Corps of Engineers to cross streams, and from the Fish and Wildlife Service to build the Pipeline despite its impact on listed species.  The Commission again ordered Mountain Valley to stop construction.  Letter from Terry L. Turpin, Dir., Off. of Energy Projects, Fed. Energy Regul. Comm'n, to Matthew Eggerding, Counsel, Mountain Valley Pipeline, LLC (Oct. 15, 2019) (Stop Work Order), J.A. 633–34.

### D.

By the time the Commission halted work in response to the Fourth Circuit's decisions, Mountain Valley had already built a substantial portion of the Pipeline.  Along the way, state regulators cited the company for violations related to the project's sedimentation impacts.

In 2018, inspections by the Virginia Department of Environmental Quality of sites along the Pipeline route revealed repeated violations of state water-quality regulations. Some control measures intended to mitigate erosion and sedimentation had been improperly installed, while others had been inadequately maintained or repaired.  Those faulty controls allowed stormwater to escape the Pipeline right-of-way, depositing sediment in nearby streams.  The Department sued Mountain Valley in state court, and the parties reached a settlement requiring the company to pay more than $2 million in fines.  Press Release, Off. of the Virginia Att'y Gen., *MVP,*

9

*LLC to Pay More than $2 Million, Submit to Court-Ordered Compliance and Enhanced, Independent Third-Party Environmental Monitoring* (Oct. 11, 2019).

Similarly, the West Virginia Department of Environmental Protection issued forty-six violation notices to Mountain Valley in 2018 and 2019, many of which concerned sedimentation. The Department attached scores of photographs showing failed erosion controls along the Pipeline right-of-way. West Virginia fined Mountain Valley several hundred thousand dollars for those violations of state water-quality laws. *See* Mike Tony, *Mountain Valley Pipeline Faces $303,000 State Fine for Continued Erosion, but Pipeline Opponents Call for Bigger Penalty*, Charleston Gazette-Mail (Feb. 5, 2021), https://tinyurl.com/yckw3ryn.

E.

In September 2020, Mountain Valley regained two of the three permits it had lost. First, the Fish and Wildlife Service issued a revised biological opinion concluding that the Pipeline would not threaten the existence of listed species or adversely affect critical habitat. That same month, the relevant districts of the Army Corps of Engineers reauthorized the Pipeline under the same national permit they had relied on before.

With those authorizations in hand, Mountain Valley returned to the Commission. It asked for an extension of the three-year deadline to complete construction and approval to resume work outside Jefferson National Forest. (Construction within the national forest remained on hold pending renewed approvals from the Bureau of Land Management and the Forest Service.) The Commission responded to Mountain Valley's request in a series of orders, which petitioners challenge here.

10

1.

The Commission began with Mountain Valley's request to extend the construction deadline. In the initial Certificate Order, the Commission directed Mountain Valley to finish building the Pipeline within three years, by October 2020. But as of September 2020, construction on the Pipeline remained stalled. Mountain Valley asked for an extension of the deadline by two years, to October 2022. The Commission granted Mountain Valley's request, finding a continued market need for the Pipeline. Order Granting Requests for Extension of Time, *Mountain Valley Pipeline, LLC*, 173 FERC ¶ 61,026 (Oct. 9, 2020) (First Extension Order).

2.

Mountain Valley also asked for the Commission's approval to resume work along most of the Pipeline's route, except for the 3.5 miles within Jefferson National Forest. By that time, Mountain Valley had put 256 miles of pipe in the ground and finished restoring 155 miles of the Pipeline right-of-way. The company contended that resuming construction would protect the environment and benefit landowners by allowing final restoration of additional portions of the route.

In a companion order issued alongside the First Extension Order, the Commission granted in part Mountain Valley's request to resume construction. Order Partially Lifting Stop Work Order and Allowing Certain Construction to Proceed, *Mountain Valley Pipeline, LLC*, 173 FERC ¶ 61,027 (Oct. 9, 2020) (Resume Work Order). The Commission permitted work to resume, but only outside the same 25-mile exclusion zone (encompassing the crossing of Jefferson National Forest and adjacent watersheds) that the Commission had exempted from its prior order allowing resumed construction. The

11

Commission agreed with Mountain Valley that completing construction and restoration along most of the route—and thus replacing temporary erosion controls with permanent measures—would best serve the environment and affected landowners. *Id.* ¶¶ 30, 32.

Of relevance here, the Commission concluded that preparation of a supplemental environmental impact statement was unnecessary. Although the project's sedimentation impacts had been "slightly different" than projected due in part to "unpredictable rainfall events," the Commission determined that any deviation from its initial projections was "not significant enough to warrant" a supplemental impact statement. *Id.* ¶ 39.

The Commission also rejected arguments from petitioners that allowing construction to resume would violate Environmental Condition 9 to the original Certificate Order. That Condition, as noted, required Mountain Valley to obtain all necessary permits before commencing construction. The Commission understood that requirement to apply only to the initial commencement of construction, not to a later resumption of work.

3.

Less than a week after the Commission issued the Resume Work Order, Mountain Valley resubmitted its request to resume construction within the 25-mile exclusion zone (except for the 3.5 miles within Jefferson National Forest, where the company still lacked authorization to build). Mountain Valley presented sedimentation modeling showing that construction in the exclusion zone would not send sediment into the national forest. The Commission granted the company's request to resume building in the portion of the exclusion zone outside

12

Jefferson National Forest.  Order Partially Lifting Stop Work Orders and Allowing Certain Construction to Resume, *Mountain Valley Pipeline, LLC*, 173 FERC ¶ 61,252 (Dec. 17, 2020) (Exclusion Zone Order).

4.

Petitioners, who are various environmental groups who had intervened in the proceedings before the Commission, sought rehearing of the First Extension, Resume Work, and Exclusion Zone Orders.  Because the Commission failed to act on those rehearing requests within thirty days, they were deemed denied as a matter of law for purposes of enabling judicial review.  *See* 15 U.S.C. § 717r(a); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 5 (D.C. Cir. 2020) (en banc).  But the Commission retained power to modify its orders.  *See* 15 U.S.C. § 717r(a).  In December 2020, the Commission issued an order modifying the First Extension and Resume Work Orders.  Order Addressing Arguments Raised on Rehearing, *Mountain Valley Pipeline, LLC*, 173 FERC ¶ 61,222 (Dec. 11, 2020) (First Modification Order).  In March 2021, the Commission modified the Exclusion Zone Order.  Order Addressing Arguments Raised on Rehearing and Denying Stay, *Mountain Valley Pipeline, LLC*, 174 FERC ¶ 61,192 (Mar. 24, 2021) (Second Modification Order).

F.

Despite getting the green light from the Commission to resume construction, Mountain Valley ran into further roadblocks in the Fourth Circuit.  In December 2020, that court stayed decisions from the Huntington and Norfolk districts of the Army Corps of Engineers reverifying that construction of the Pipeline could proceed under an existing nationwide permit.  *Sierra Club v. U.S. Army Corps of Eng'rs*, 981 F.3d

13

251 (4th Cir. 2020). Mountain Valley then shifted gears, ceasing its reliance on a nationwide permit and instead applying to the Army Corps of Engineers for an individual permit. *Sierra Club*, 64 F.4th at 496. In that connection, the West Virginia Department of Environmental Protection certified that construction of the Pipeline would not violate the state's water quality standards. *Id.* at 498. Absent that certification, Mountain Valley could not obtain an individual permit. *See id.* at 496 (citing 33 U.S.C. § 1341(a)(1)).

Meanwhile, the Bureau of Land Management and the Forest Service issued new decisions authorizing construction in Jefferson National Forest. But in January 2022, after the close of briefing in this case, the Fourth Circuit vacated those renewed authorizations. *Wild Va. v. U.S. Forest Serv.*, 24 F.4th 915 (4th Cir. 2022). About a week later, the Fourth Circuit also vacated the Fish and Wildlife Service's latest approvals. *Appalachian Voices v. U.S. Dep't of Interior*, 25 F.4th 259 (4th Cir. 2022). Those decisions again left Mountain Valley without three federal permits necessary to complete construction.

G.

In June 2022, Mountain Valley again asked the Commission to extend the construction deadline, this time by four years, until October 2026. The Commission granted that request. Order Granting Request for Extension of Time, *Mountain Valley Pipeline, LLC*, 180 FERC ¶ 61,117 (Aug. 23, 2022) (Second Extension Order). With the First Extension Order having lapsed during the pendency of this case (in October 2022), the Second Extension Order—and its deadline of October 2026— now governs the project.

14

In February and May 2023, Mountain Valley regained two federal permits.  First, the Fish and Wildlife Service issued a further revised biological opinion concluding that the Pipeline would not threaten the existence of listed species or adversely affect critical habitat.  Letter from Cindy Schulz, Field Supervisor, Va. Ecological Servs., U.S. Fish & Wildlife Serv., to Kimberly Bose, Sec'y, Fed. Energy Regul. Comm'n (Feb. 28, 2023), https://tinyurl.com/3ytrnrkr.  Second, the Forest Service and the Bureau of Land Management issued new decisions authorizing construction in Jefferson National Forest. Forest Serv., U.S. Dep't of Agric., Record of Decision, Mountain Valley Pipeline and Equitrans Expansion Project (May 2023), https://tinyurl.com/3mrpnubp; Bureau of Land Mgmt., U.S. Dep't of Interior, Record of Decision, Mountain Valley Pipeline and Equitrans Expansion Project Decision to Grant Right-of-Way and Temporary Use Permit (May 2023), https://tinyurl.com/2tts6zky.

Meanwhile, in April, Mountain Valley met another, separate setback in the Fourth Circuit:  that court vacated the West Virginia Department of Environmental Protection's certification that the Pipeline's construction would not violate the state's water quality standards.  *Sierra Club*, 64 F.4th 487. That decision leaves uncertain whether Mountain Valley will be able to obtain required authorization from the Army Corps of Engineers through an individual permit.

II.

Petitioners challenge the following Commission orders: (i) the First Extension Order, which extended the construction deadline for the Pipeline from October 2020 until October 2022; (ii) the Resume Work Order, which permitted Mountain Valley to resume work outside the 25-mile exclusion zone encompassing the crossing of Jefferson National Forest and the

15

adjacent watersheds; (iii) the Exclusion Zone Order, which allowed Mountain Valley to build in the portion of the exclusion zone outside Jefferson National Forest; (iv) the First Modification Order, which modified the First Extension and Resume Work Orders by addressing certain issues raised in petitioners' requests for rehearing; and (v) the Second Modification Order, which modified the Exclusion Zone Order by elaborating on the Commission's reasons for allowing Mountain Valley to move forward with its project in response to arguments raised in the requests for rehearing.

Before turning to the merits of those challenges, we consider our jurisdiction to address them.  We conclude that we retain jurisdiction to consider all of petitioners' claims except their challenge to the First Extension Order.

A.

Because Article III of the Constitution grants federal courts power to resolve only "actual, ongoing controversies," we lose jurisdiction over a pending claim if it becomes moot. *Planned Parenthood of Wis., Inc. v. Azar*, 942 F.3d 512, 516 (D.C. Cir. 2019) (quotation marks and citation omitted).  A claim is moot if intervening events mean the court's "decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (quotation marks and citation omitted).  The operative question is whether we can grant "any effectual relief whatever to the prevailing party."  *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 161 (2016).  The "initial heavy burden of establishing mootness lies with the party asserting" mootness, and "the opposing party bears the burden of showing an exception applies."  *Honeywell Int'l, Inc. v. Nuclear Regul. Comm'n*, 628

16

F.3d 568, 576 (D.C. Cir. 2010) (quotation marks and citation omitted).

1.

We first consider whether the Fourth Circuit's latest decisions vacating three agencies' authorizations for the Pipeline render this case moot. Although no party so argues, we also "have an independent obligation to ensure that appeals before us are not moot." *Planned Parenthood*, 942 F.3d at 516 (quotation marks and citation omitted).

Petitioners ask us to redress their asserted injuries by vacating the Commission's orders allowing construction of the Pipeline to continue. If the Fourth Circuit's decisions invalidating other agencies' actions completely foreclosed any possibility of future construction, then a decision in this case vacating the Commission's orders might have no effect on petitioners' rights. But none of the Fourth Circuit's decisions, whether considered individually or in combination, sweeps so broadly.

Most obviously, the Fourth Circuit's decisions vacating authorizations (or more accurately, reauthorizations) from the Bureau of Land Management, Forest Service, and Fish and Wildlife Service do not affect this case. Mountain Valley subsequently regained those permits, as described above. *See* p. 14, *supra*.

That leaves the Fourth Circuit's decisions vacating the Army Corps of Engineers' approval to build the Pipeline across waterbodies and the West Virginia Department of Environmental Protection's certification pertaining to obtaining an individual permit from the Army Corps of Engineers. Mountain Valley represents that it has completed

17

some 94 percent of Pipeline construction.  And at least some of the remaining 6 percent entails building across streams, protected habitats, or both, such that construction in those areas could not be completed until Mountain Valley regains the approvals that have been vacated by the Fourth Circuit.

But nothing in the record establishes that the Fourth Circuit's decisions entirely preclude Mountain Valley from engaging in construction on the project.  To the contrary, construction could continue in certain areas adjacent to wetlands, even while the company awaits permission from the Army Corps of Engineers to build within wetlands. That remains true after the Fourth's Circuit's recent April 2023 decision, which affects only whether Mountain Valley can obtain permission from the Army Corps of Engineers to build within wetlands.  Petitioners' challenge to the Commission's orders, by contrast, seeks to halt Pipeline construction everywhere along the right-of-way, beyond the specific areas covered by the other federal permits.

There is also a more-than-speculative chance that Mountain Valley will reacquire the vacated Army Corps of Engineers' permit, freeing the company to resume building in the affected areas.  (Indeed, Mountain Valley has already regained approvals from the Bureau of Land Management, Forest Service, and Fish and Wildlife Service, as noted above.) But a decision from this court vacating the Commission's approval for the project as a whole would preclude a resumption of work regardless.  For those reasons, the Fourth Circuit's decisions do not moot this case.

2.

We next consider whether the expiration of the First Extension Order during the pendency of this case moots

18

petitioners' challenge to that particular order. Mountain Valley contends in a post-argument submission that it does. The company argues that, because the October 2022 deadline set out in the First Extension Order has passed, and that order has been superseded by the Second Extension Order's establishment of a new deadline of October 2026, petitioners can no longer "show[] that they have suffered some actual injury that can be redressed" by our review of the First Extension Order. *Freeport-McMoRan Oil & Gas Co. v. FERC*, 962 F.2d 45, 46 (D.C. Cir. 1992) (quotation marks and citation omitted). We agree.

When a challenged order expires during the pendency of litigation, the challenge generally becomes moot—at least when, as here, the challenger seeks only prospective relief. *See id.*; *Nw. Pipeline Corp. v. FERC*, 863 F.2d 73, 75–77 (D.C. Cir. 1988); *Md. People's Counsel v. FERC*, 761 F.2d 768, 773 (D.C. Cir. 1985). The First Extension Order has expired and has been superseded by a subsequent order that now governs. A decision on the First Extension Order's validity thus would "neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *Clarke*, 915 F.2d at 701.

Petitioners contend that a live controversy remains because the First Extension Order's collateral consequences continue to harm them. They reason that the Commission could not have issued the Second Extension Order if not for the First Extension Order, without which the initial Certificate Order would have already expired. But even so, it does not follow that petitioners' challenge to the First Extension Order remains live. Petitioners could separately seek review of the Second Extension Order, but their challenge to the First Extension Order—which no longer has any legal effect—does not remain justiciable merely because that order's one-time

19

existence enabled the Commission to issue a subsequent extension order that now governs.

Nor have petitioners carried their burden of showing that an exception to mootness applies. Petitioners invoke two cases in which we have applied the "capable of repetition, yet evading review" exception to mootness. *See Montgomery Env't Coal. v. Costle*, 646 F.2d 568, 578–79 (D.C. Cir. 1980); *Humane Soc'y v. EPA*, 790 F.2d 106, 112–14 (D.C. Cir. 1986). Under that exception, a claim is not moot if "the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration" and "there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Trump v. Mazars USA, LLP*, 39 F.4th 774, 786 (D.C. Cir. 2022) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975) (per curiam)).

That exception is inapplicable here. Even if the First Extension Order was "in its duration too short to be fully litigated prior to its . . . expiration," petitioners have not shown that their challenge to it is "capable of repetition." *Id.* A challenge is "capable of repetition" only if "the legal wrong complained of by the plaintiff is reasonably likely to recur," *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 324 (D.C. Cir. 2014) (quotation marks and citation omitted), framed "in terms of the legal questions [the challenge] presents for decision," *J.T. v. Dist. of Columbia*, 983 F.3d 516, 524 (D.C. Cir. 2020) (quotation marks and citation omitted). It is therefore not enough that the Commission can—or did—issue another order extending the timeline for the Pipeline. It must also be the case that the Second Extension Order—or any other orders "reasonably likely to recur" in the future—presents the same alleged legal wrong and the same legal question as the First Extension Order.

20

The "legal wrong" of which petitioners complain in their challenge to the First Extension Order is the Commission's finding of continued market need for the Pipeline. Petitioners ask us to decide whether that finding was supported by substantial evidence based on the record before the Commission at the time it issued the First Extension Order. That is "not the type of legal question that is capable of repetition as it is sharply focused on a unique factual context." *J.T.*, 983 F.3d at 527–28 (quotation marks and citation omitted). To be sure, petitioners suggest that the Commission repeats its legal wrongs from the First Extension Order in the Second Extension Order. But an analysis of market need "necessarily varies from one . . . period to the next, depending upon the circumstances the [Commission] considers," such that any challenge to the Second Extension Order would "require review of a different record from the one on which the [First Extension Order was] issued." *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 264 F. App'x 10, 13 (D.C. Cir. 2008).

Petitioners thus have not shown that their challenge to the First Extension Order is "capable of repetition," or that any other mootness exception applies. As a result, petitioners' challenge to that order is moot.

B.

We turn next to statutory jurisdiction. Mountain Valley contends that we lack jurisdiction under the Natural Gas Act to consider petitioners' challenge to the Exclusion Zone and Second Modification Orders. The problem, according to Mountain Valley, is that petitioners never filed a separate petition seeking judicial review of the Second Modification Order, which amended the Exclusion Zone Order. We are unpersuaded.

21

Under the Natural Gas Act, a party aggrieved by an order of the Commission has thirty days to seek rehearing before the agency and must do so before coming to court. 15 U.S.C. § 717r(a). Petitioners timely sought rehearing of the Exclusion Zone Order. The Act gives the Commission thirty days to act on a request for rehearing. Otherwise, the rehearing request is "deemed to have been denied," and an aggrieved party is free to petition for judicial review. *Id.*

In the past, the Commission frequently issued tolling orders to extend its deadline for resolving requests for rehearing. But in *Allegheny Defense Project*, we held that such tolling orders "are not the kind of action on a rehearing application that can fend off a deemed denial and the opportunity for judicial review." 964 F.3d at 3–4.

Here, the Commission failed to act on petitioners' request for rehearing of the Exclusion Zone Order within thirty days. The resulting denial of rehearing as a matter of law put both petitioners and the Commission on the clock. Petitioners had sixty days to petition for judicial review. 15 U.S.C. § 717r(b). As for the Commission, although it had missed the deadline for resolving the rehearing requests on their merits, it retained authority to "modify or set aside" its original orders in response to the arguments raised on rehearing, "[u]ntil the record in [the] proceeding [was] filed in [the] court of appeals." *Id.* § 717r(a).

After petitioners' application for rehearing of the Exclusion Zone Order was deemed denied as a matter of law, petitioners sought judicial review of that order. But the Commission could still modify the order until the record of the proceeding was filed in our court. The Commission exercised that authority by issuing the Second Modification Order, in which it updated its discussion in the Exclusion Zone Order to

22

address arguments raised on rehearing.  Petitioners did not file a separate petition for review to challenge the Second Modification Order.

Mountain Valley contends that we lack jurisdiction to consider petitioners' challenges to the Exclusion Zone and Second Modification Orders.  According to Mountain Valley, the Exclusion Zone Order was not final agency action for purposes of judicial review, despite the denial of rehearing as a matter of law, because the Commission later took final action on the rehearing application in the Second Modification Order.  And we also lack jurisdiction over the Second Modification Order, Mountain Valley maintains, because petitioners failed to file a petition for review designating that order as among those they challenged.

Our decision in *Allegheny Defense Project* forecloses Mountain Valley's arguments.  As we explained there, when the Commission fails to act on a rehearing application within thirty days, "the applicant may deem its rehearing application denied and seek judicial review of the now-final agency action."  *Allegheny Def. Project*, 964 F.3d at 13.  Here, accordingly, when the Commission failed to act on petitioners' rehearing request within thirty days, petitioners were free to deem it denied and seek judicial review, which they did.

To be sure, in its notice that rehearing had been denied by operation of law, the Commission expressed its intention to address the arguments raised on rehearing in a future order modifying the Exclusion Zone Order.  But if mere mention of a desire to amend the original order at some unspecified future time had the effect of forestalling judicial review, then the Commission's notice of denial by operation of law would be no different from the tolling orders we rejected in *Allegheny Defense Project*.  As we said there, "the question is not one of

23

labels, but of signification." *Id.* No statement of intent to act in the future, regardless of what the order containing that statement may be called, can prevent an action from becoming final if the Commission fails to decide the merits of a rehearing application within thirty days. The Exclusion Zone Order thus became final agency action subject to challenge in court when the Commission failed to decide petitioners' rehearing request within the allotted time.

We also have jurisdiction to consider the Second Modification Order. A petition for review must "specify the order or part thereof to be reviewed." Fed. R. App. P. 15(a)(2). It is undisputed that petitioners complied with that requirement when initially seeking review of the Exclusion Zone Order. After petitioners sought review in our court but before the record in the proceeding was filed with us, the Commission exercised its discretion to modify the Exclusion Zone Order by issuing the Second Modification Order.

Petitioners were under no obligation to file a new petition for review challenging that additional order. Mountain Valley portrays the Second Modification Order as a "rehearing order" requiring a separate petition. But as we have explained, when the Commission failed to act on petitioners' rehearing request within thirty days, rehearing was denied as a matter of law. At that point, the Commission was limited to updating the Exclusion Zone Order rather than granting rehearing of it. The Second Modification Order, then, was not a new order, but was an amendment to the Exclusion Zone Order. Because the Exclusion Zone Order, as amended, remains the operative order that petitioners challenge, their petitions adequately specify the orders to be reviewed.

In any event, we have held that "inexact specification of the order to be reviewed will not be fatal to the petition . . . if

24

the petitioner's intent to seek review of a specific order can be fairly inferred from the petition for review or from other contemporaneous filings, and the respondent is not misled by the mistake." *LaRouche's Comm. for a New Bretton Woods v. FEC*, 439 F.3d 733, 739 (D.C. Cir. 2006) (quotation marks and citation omitted).  We can fairly infer from the petitions for review that petitioners intended to seek review not only of the Exclusion Zone Order but also of any amendment to it.  And the Commission could not have been misled, given our explanation in *Allegheny Defense Project* of how the statutory scheme operates, including the Commission's power to modify orders up to the time when the record is filed in court.  Indeed, the Commission does not join Mountain Valley in contesting our jurisdiction over the Second Modification Order.

We therefore have jurisdiction to review the Second Modification and Exclusion Zone Orders (and also the Resume Work and First Modification Orders, as to which there is no challenge to our jurisdiction and over which we undoubtedly have jurisdiction).

III.

We assess petitioners' challenges to the Commission's orders under the APA's arbitrary-or-capricious standard of review.  *See* 5 U.S.C. § 706(2)(A).  The Commission's orders must be sustained so long as they "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (alterations adopted) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

25

A.

We first consider whether the Commission erred in the Resume Work and Exclusion Zone Orders by allowing construction to resume before Mountain Valley reacquired all its other permits.  We reject those challenges.

1.

Petitioners contend that the Commission violated Environmental Condition 9 to the Certificate Order by permitting construction to resume even though Mountain Valley was still waiting on reauthorization to build in Jefferson National Forest.  Environment Condition 9 required Mountain Valley to "receive written authorization" from the Commission "before commencing construction of any project facilities." Certificate Order, App. C, Environmental Condition 9.  And to obtain that authorization from the Commission, Mountain Valley needed to show "that it ha[d] received all applicable authorizations required under federal law."  *Id.*

The Commission interpreted that condition to require obtaining "all relevant authorizations before the company can commence construction" at the outset of the project, without carrying any "ongoing obligation once those authorizations have been obtained and the Commission has" permitted construction to begin.  Second Modification Order ¶ 16.  On that reading, "Environmental Condition 9 applies to newly-certificated and unconstructed facilities," but not in "a scenario where applicable federal authorizations are vacated after a company has obtained necessary federal authorizations and commenced construction."  *Id.*   That is because "the invalidation of a specific federal authorization does not necessarily invalidate an authorization to construct generally,

26

particularly if significant construction is already underway."
Resume Work Order ¶ 17.

We sustain the Commission's interpretation of
Environmental Condition 9, particularly in view of the
deference we accord to the Commission's interpretation of its
own adjudicatory orders. *See Cellco P'ship v. FCC*, 700 F.3d
534, 544 (D.C. Cir. 2012); *Sw. Gas Corp. v. FERC*, 145 F.3d
365, 370 (D.C. Cir. 1998). The condition's use of the word
"commencing" suggests that it applies at the start of
construction. Petitioners argue that the phrase "of any project
facilities" suggests that all authorizations must be in place
before Mountain Valley constructs each successive portion of
the Pipeline. But the word "any" is just as naturally read to
indicate that all necessary authorizations needed to be in place
before Mountain Valley could initially commence construction
on even one—i.e., any—project facility.

As the Commission explained, moreover, if a particular
federal authorization is vacated after construction has begun,
the Commission's staff "evaluates the circumstances along the
pipeline's right-of-way as they exist at the time and determines
what course of action would be most protective of the
environment." Resume Work Order ¶ 19. In some situations,
especially if a substantial portion of construction is already
underway, "it may be most protective of the environment for
additional construction to proceed." *Id.* For instance, if
construction is nearly complete on one segment of a pipeline
when a court vacates an authorization affecting a different
segment, it might be prudent to allow construction to continue
along the first segment, hastening final restoration of the right-
of-way for the benefit of the environment and landowners. The
Commission's interpretation of Environmental Condition 9
enables that choice, whereas petitioners' competing
interpretation would deny it.

27

The Commission also adequately explained why resuming construction was advisable in this case.  At the time of the Resume Work Order, there were about 100 miles of the Pipeline right-of-way where Mountain Valley had put pipe in the ground but had yet to complete restoration work.  The Commission explained that leaving temporarily stabilized areas exposed to the elements can cause "slips, overwhelmed erosion control devices, and gradual degradation of annual/seasonal cover crops and/or mulch," while temporary controls require regular upkeep.  *Id.* ¶ 30.  Moving more of the Pipeline right-of-way into final restoration would ameliorate those issues.  Replacing temporary erosion and sedimentation controls with permanent measures "would more effectively stabilize slip-prone areas, eliminate or significantly reduce erosion and sedimentation off the right-of-way, and protect sensitive resources such as waterbodies, wetlands, and habitats for wildlife and aquatic species."  *Id.*  The Commission reasonably concluded, then, that allowing construction to resume would benefit the environment, even without all other authorizations in place.  *Id.*

Petitioners cite a Fourth Circuit decision addressing a challenge to a permit issued by the National Park Service for a different pipeline project.  *See Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260 (4th Cir. 2018).  That decision suggests in a footnote that a condition identical to Environmental Condition 9 required all federal authorizations to be in place not only for construction to begin but also for construction to continue.  *Id.* at 284 n.11.  In the Resume Work Order, the Commission acknowledged that decision but clarified that "the invalidation of a specific federal authorization does not necessarily invalidate an authorization to construct generally, particularly if significant construction is already underway."  Resume Work Order ¶ 17.

28

The Fourth Circuit's brief discussion of the condition in that decision does not govern here. As the Commission underscores, the Fourth Circuit's decision addressed only a pipeline's ability to unilaterally proceed to construction after the invalidation of a federal authorization. *See Sierra Club*, 899 F.3d at 284 & n.11. It did not contend with a scenario in which, as here, the Commission expressly authorized construction to resume following invalidation of a federal authorization. *See* Comm'n Br. 37. Moreover, the Commission was not a party in the Fourth Circuit's case and so had no opportunity to present its explanation of the meaning of the condition to that court. This case afforded the Commission its first opportunity to explain its interpretation, which we sustain.

The Resume Work and Exclusion Zone Orders are thus consistent with Environmental Condition 9, as interpreted by the Commission.

2.

Petitioners next contend that constructing segments of the Pipeline up to the border of Jefferson National Forest will create unwarranted bureaucratic momentum pressuring the Bureau of Land Management and Forest Service to allow construction within the national forest. Relying on the Fourth Circuit's decision in *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986), petitioners imagine the partially completed segments of the Pipeline "stand[ing] like gun barrels pointing into the heartland" of the national forest. Pet'rs' Br. 51 (quoting *Gilchrist*, 808 F.2d at 1042).

Our court has rejected the "bureaucratic momentum" analysis from the Fourth Circuit's *Gilchrist* decision, observing

29

that it "lacks vitality." *Karst Env't Educ. & Prot., Inc. v. EPA*, 475 F.3d 1291, 1297 (D.C. Cir. 2007). In the Exclusion Zone Order, however, the Commission seemed to acknowledge that, at least in some situations, one agency's approval of a project could create bureaucratic momentum unduly affecting another agency's consideration of the project. *See* Exclusion Zone Order ¶¶ 12–13. But because the Bureau of Land Management and Forest Service had already approved the Pipeline's route through Jefferson National Forest, the Commission concluded that its own decision allowing construction to resume would impose no undue pressure on those agencies.

By their nature, interstate pipeline projects frequently require multiple federal permits, as this case illustrates. And no agency could be the first to approve such a project if it were forbidden from creating any bureaucratic momentum that might influence other agencies. But even assuming without deciding that a bureaucratic momentum argument could be viable in certain situations, we conclude that the Commission reasonably rejected petitioners' argument here.

By the time of the Exclusion Zone Order, the Bureau of Land Management and the Forest Service had twice rejected all possible alternative routes through Jefferson National Forest. *Id.* ¶ 13. In that context, the Commission could allow construction of the Pipeline up to the border of the national forest without putting any undue pressure on those other agencies, which had already decided that the Pipeline's sole viable path through the national forest was one corresponding to the route of Mountain Valley's construction outside the forest. In the circumstances of this case, petitioners' bureaucratic momentum argument thus fails.

30

B.

Petitioners' final two challenges pertain to the Commission's decision not to prepare a supplemental environmental impact statement before permitting construction to resume. An agency must supplement its environmental impact statement when "significant new circumstances or information" raise additional concerns about an action's impact. 40 C.F.R. § 1502.9(d)(1)(ii). As we have emphasized, a supplemental environmental impact statement "must be prepared only where new information 'provides a *seriously* different picture of the environmental landscape.'" *Stand Up for California! v. U.S. Dep't of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (quoting *Friends of Cap. Crescent Trail v. FTA*, 877 F.3d 1051, 1060 (D.C. Cir. 2017)).

1.

Petitioners contend that the Commission should have prepared a supplemental environmental impact statement to consider the effects of blasting activity along the Pipeline right-of-way. They rely on one line in the final environmental impact statement noting that Mountain Valley had "not determined whether blasting would be necessary for construction" of the Pipeline. Final Environmental Impact Statement 4-203, J.A. 71. In practice, blasting has been required along much of the right-of-way. Petitioners argue that the widespread use of blasting constitutes significant new information warranting a supplemental impact statement. The Commission reasonably rejected that contention.

The final environmental impact statement included a thorough discussion of the potential impacts of blasting. The Commission recognized that blasting likely would be necessary along much of the Pipeline's route. The final

31

environmental impact statement explained that Pipeline construction "would cross 216 miles of shallow depth to bedrock," *id.* at 4-44, J.A. 16, and "the potential for blasting exists at all locations where shallow bedrock may be encountered," *id.* at 4-43, J.A. 15. Given the likelihood of blasting, the Commission explored in detail the potential environmental harms that could result, including the impact on aquifers, fish and other aquatic species, bald and golden eagles, people and animals who are bothered by loud noises, and so forth.

Nothing in the record, moreover, suggests that the actual impacts of blasting to this point have differed in any material respect from the impacts the Commission anticipated in the final environmental impact statement. The Commission thus reasonably determined in the Resume Work Order that "impacts from blasting and construction [on] steep slopes were adequately addressed" in the final environmental impact statement. Resume Work Order ¶ 40.

2.

Petitioners next contend that the Commission's final environmental impact statement "vastly overestimated" the effectiveness of Mountain Valley's erosion and sedimentation controls, necessitating a supplemental analysis addressing sedimentation before construction can resume. Pet'rs' Br. 41. We conclude that the Commission failed to provide an adequate explanation in rejecting that claim. While petitioners primarily take issue with the Commission's rejection of that claim in the Resume Work Order, they frame their challenge as encompassing all orders on review, *see id.* at 15–17, 45, and the Commission does not argue otherwise. We accordingly treat the challenge as reaching all challenged orders.

32

In the final environmental impact statement, the Commission repeatedly stated that Mountain Valley's proposed control measures would "minimize" erosion and sedimentation associated with Pipeline construction. For instance, Mountain Valley would "minimize or avoid" any "minor temporary fluctuations in surface water turbidity" associated with digging the Pipeline trench by "implement[ing] . . . the construction practices outlined" in the company's erosion and sedimentation control plans. Final Environmental Impact Statement 4–137, J.A. 53.

Petitioners submit that Mountain Valley's controls significantly failed to minimize sedimentation impacts to the extent the Commission predicted. In supporting that claim, petitioners rely on information arising from state enforcement actions brought by Virginia and West Virginia. Virginia, in suing Mountain Valley for environmental violations, documented numerous instances in which construction of the Pipeline resulted in deposits of significant levels of sediment in streambeds. And West Virginia likewise issued dozens of violation notices to Mountain Valley associated with failed sediment controls along the Pipeline right-of-way, leading to substantial fines. Before the Commission, petitioners invoked the record underlying those enforcement actions as proof that the sedimentation impacts of Pipeline construction have been "seriously different" than originally anticipated. *Stand Up for California!*, 994 F.3d at 629 (quotation marks, citation, and emphasis omitted).

In the face of petitioners' presentation of that information, the Commission needed to explain why it was inadequate to show a substantial deviation from the prior environmental impact analysis. *See Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989). But the Commission failed to offer a reasoned

33

explanation in that regard.  Even under our deferential standard
of review, we cannot sustain its decision.

The Commission "acknowledge[d] that there have been
slightly different outcomes than those projected" in the final
environmental impact statement.  Resume Work Order ¶ 39.
The Commission summarily attributed those different
outcomes to "unpredictable rainfall events," and stated without
elaboration that "the resulting impacts" from erosion and
sedimentation "are not significant enough to warrant a
supplemental [environmental impact statement]."  *Id.*  But that
bare conclusion, without any support or explanation, is
insufficient to pass muster.  The Commission further noted that
its compliance monitors regularly inspect Pipeline construction
sites to ensure Mountain Valley's implementation of required
controls.  *Id.*  Those controls, though, failed to prevent the
sedimentation documented by state regulators.  And the
Commission did not explain why those controls would more
likely be effective going forward (aside from the one passing
reference to unusual rainfall in the past).  Nor did the
Commission clarify or update its rationale after petitioners
argued in their request for rehearing that the Commission had
wrongfully dismissed post-certification evidence about
sedimentation.  First Modification Order ¶¶ 9–10.

With respect to petitioners' reliance on the state
enforcement actions, the Commission offered just one sentence
in response:  "Mountain Valley reached consent decrees with
both Virginia [] and West Virginia [] to resolve violations of
state environmental standards and regulations and no
additional action by the Commission is necessary at this time."
First Extension Order ¶ 27.  But the mere fact that state
regulators may have settled their actions against Mountain
Valley does not itself afford a basis for declining to prepare a
supplemental environmental impact statement.  State

34

enforcement of environmental laws in response to worse-than-anticipated impacts does not absolve the Commission of its duty to assess the environmental impacts of the project under federal law.

Those consent decrees require Mountain Valley to implement additional sedimentation controls.  Consent Decree at 7–9, *Paylor v. Mountain Valley Pipeline, LLC*, No. CL18006874-00 (Va. Cir. Ct. Dec. 11, 2019).  And perhaps those additional measures will ensure that the remainder of construction produces no significant sedimentation impacts beyond those already anticipated.  But the challenged orders do not offer that or any other explanation for why the consent decrees eliminate the need for a supplemental environmental impact statement.

The Commission also points out that the final environmental impact statement predicted that building the Pipeline would lead to some sedimentation.  Comm'n Br. 60–61 (citing Certificate Order ¶ 146).   But a supplemental environmental impact statement is necessary not only when the nature of a project's environmental impacts is significantly different than anticipated, but also when the extent of those impacts is significantly greater than predicted.  *Marsh*, 490 U.S. at 374.  The Commission failed to engage with whether the level of sedimentation observed along the Pipeline right-of-way was substantially different than expected.  For those reasons, the Commission's explanation of its decision not to prepare a supplemental environmental impact statement was arbitrary and capricious.

C.

Because the Commission inadequately addressed whether a supplemental environmental impact statement was necessary

35

in light of the project's sedimentation impacts, we must remand that matter to the Commission. We remand all of the challenged orders (except the now-moot First Extension Order) because of that deficiency. We do so, however, without vacating the challenged orders' approval of resuming construction.

"The decision to vacate depends on two factors: the likelihood that 'deficiencies' in an order can be redressed on remand, even if the agency reaches the same result, and the 'disruptive consequences' of vacatur." *Black Oak Energy, LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013) (quoting *Allied–Signal v. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)). With regard to the first factor, "[w]hen an agency bypasses a fundamental procedural step, the vacatur inquiry asks not whether the ultimate action could be justified, but whether the agency could, with further explanation, justify its decision to skip that procedural step." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1052 (D.C. Cir. 2021).

Here, the Commission failed to adequately explain its decision not to prepare a supplemental environmental impact statement. But after adequately accounting for the evidence of sedimentation impacts along the Pipeline's right-of-way, the Commission could again conclude that a new impact statement is unnecessary, perhaps in part because of additional control measures required by the state consent decrees. As for the second factor, construction of the Pipeline is more than ninety percent complete, with many portions of the route nearing final restoration. And in the Commission's view, the completion of restoration would help ameliorate the project's sedimentation impacts. *See* pp. 10–11, *supra*. In those circumstances, vacating the Commission's orders would be "quite disruptive." *Food & Water Watch*, 28 F.4th at 292 (quoting *City of Oberlin*

36

*v. FERC*, 937 F.3d 599, 611 (D.C. Cir. 2019)).   We thus
exercise our discretion to remand without vacatur.

*     *     *     *     *

For the foregoing reasons, we dismiss in part, grant in part,
and deny in part the petitions for review.   We dismiss as moot
the petitions insofar as they challenge the First Extension
Order.   We grant the petitions insofar as they challenge the
Commission's explanation of its decision not to prepare a
supplemental environmental impact statement concerning the
project's sedimentation impacts, and we deny the petitions with
respect to petitioners' other arguments.   Accordingly, we
remand the Resume Work, Exclusion Zone, First Modification,
and Second Modification Orders to the Commission without
vacatur for further proceedings consistent with this opinion.

*So ordered.*